## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| COLLEEN DELUCA, | : | Civil No. 3:19-CV-01661 |
| | : | |
| Plaintiff, | : | |
| | : | |
| v. | : | |
| | : | |
| UNITED FINANCIAL CASUALTY | : | |
| COMPANY, | : | |
| | : | |
| Defendant. | : | Judge Jennifer P. Wilson |

### MEMORANDUM

Before the court is a motion for partial summary judgment filed by Defendant United Financial Casualty Company ("United Financial").  (Doc. 31.) The court finds that United Financial did not act in bad faith because it had a reasonable basis for delaying payment of Plaintiff Colleen DeLuca's ("DeLuca") uninsured motorist benefits.  For the reasons that follow, the court will grant United Financial's motion for partial summary judgment.

### FACTUAL AND PROCEDURAL BACKGROUND

In considering United Financial's motion for partial summary judgment, the court relied on the uncontested facts, or where the facts were disputed, viewed the facts and deduced all reasonable inferences therefrom in the light most favorable to DeLuca as the nonmoving party in accordance with the relevant standard for deciding a motion for summary judgment.  *See Doe v. C.A.R.S. Prot. Plus, Inc.*, 527 F.3d 358, 362 (3d Cir. 2008).

1

On August 28, 2017, DeLuca was involved in a motor vehicle accident while traveling north on South Mountain Boulevard in Fairview Township, Luzerne County, Pennsylvania.  (Doc. 31-1, ¶ 1; Doc. 38, ¶ 1.)  DeLuca was purportedly driving in the right lane when an unidentified vehicle turned in front of her vehicle, collided with DeLuca's vehicle, and fled the scene.[1]  (Doc. 38, ¶ 1.)  At the time of the accident, DeLuca was insured by an automobile insurance policy issued by United Financial ("the policy").[2]  (Doc. 31-1, ¶ 2; Doc. 38, ¶ 2.)  The policy provides up to $300,000 in uninsured motorist ("UM") coverage with up to $100,000 for first party medical expenses.  (Doc. 31-2, p. 3.)[3]  The language of the policy relating to UM coverage provides:

> Subject to the Limits of Liability, if **you** pay the premium for Uninsured Motorist Coverage, **we** will pay for damages, other than punitive or exemplary damages, which an **insured** is legally entitled to recover from the **owner** or operator of an **uninsured auto** because of **bodily injury**:
> 1.    sustained by an **insured**;
> 2.    caused by an **accident**; and

---

[1] The facts surrounding how the accident occurred are not material to the court's analysis, other than the fact that the other driver hit DeLuca and fled the scene of the accident.

[2] The policy lists "Progressive" as the insurer underwritten by United Financial with policy number 01261691-3.  (Doc. 31-2, p. 2.)  United Financial is a subsidiary of Progressive Commercial Holdings, Inc., which in turn is a subsidiary of The Progressive Corporation.  (Doc. 31-1, p. 3, n.2; Doc. 38, p. 1, n.1.)

[3] For ease of reference, the court utilizes the page numbers from the CM/ECF header.

     3.     arising out of the ownership, maintenance, or use of an **uninsured auto**.

(Doc. 31-2, p. 31.)

     On September 6, 2017, United Financial opened a UM claim for DeLuca and assigned the claim to Dawn Eberle ("Eberle"). (Doc. 31-3, p. 2.) Eberle has been a claims professional for approximately thirty years with the last thirteen years working for Progressive Casualty Insurance. (Doc. 31-4, pp. 2–3.)

     On September 7, 2017, Eberle reviewed DeLuca's UM claim. (Doc. 31-3, pp. 2–4.) She noted DeLuca's available policy limits, that the other driver was not identified, and that the police were still investigating the accident. (*Id.* at 2–3.) Eberle contacted businesses near the scene of the accident in an attempt to locate additional surveillance videos or witnesses that could identify the driver of the unidentified vehicle. (*Id.* at 3.) She also called DeLuca and discussed the facts of the accident and DeLuca's injuries, which included a sore neck and back as well as a headache. (*Id.* at 4–5.) DeLuca reported that, following the accident, she went to the emergency room via ambulance and missed three days of work. (*Id.* at 5.) She followed up with her primary care physician and "feels everything will be fine but is waiting to see." (*Id.*) Eberle also noted that DeLuca fractured her vertebrae in 2010. (*Id.* at 4.)

     On October 9, 2017, Eberle received and reviewed the police report, which confirmed that the accident was a hit and run and that the unidentified vehicle

improperly and carelessly turned in front of DeLuca striking her vehicle and pushing it into a curb and pole. (*Id.* at 5.) That same day, Eberle spoke to DeLuca regarding her medical treatment. (*Id.* at 5–6.) DeLuca reported that she had an MRI on the day of the accident, recently had another MRI as recommended by her doctor, and scheduled a visit with a neurologist. (*Id.*) She also provided Eberle with authorization to view the medical records contained in United Financial's first party medical benefits ("PIP") file. (*Id.* at 6.) Eberle advised DeLuca that she would follow up in two weeks following DeLuca's neurology appointment. (*Id.*)

Eberle received and reviewed the medical records contained in DeLuca's PIP file on November 13, 2017. (*Id.* 6–7.) Eberle noted that DeLuca had a CT scan at the emergency room following the accident that showed "healed posttraumatic deformities at C2, C4, C5." (*Id.* at 6.) The records indicated that DeLuca had a neurosurgical consultation on October 10, 2017, during which she described neck pain from the accident with numbness in her fingertips, and indicated that she had fallen since the accident. (*Id.*) The neurosurgeon recommended physical therapy and trigger point injections, as well as a follow-up appointment in eight weeks. (*Id.* at 7.) Eberle noted that she would need to follow-up with DeLuca regarding the post-accident fall and requested primary care physician records for the past three years. (*Id.*)

On December 13 and 19, 2017, Eberle left voicemails for DeLuca. (*Id.*) DeLuca returned Eberle's call and left a voicemail on December 21, 2017, stating that she was recently diagnosed with adult asthma and just started going to physical therapy twice per week. (*Id.* at 8.) Eberle noted to follow-up in thirty days to review any additional medical records. (*Id.*) On February 8, 2018, Eberle reviewed new medical records within DeLuca's PIP file. (*Id.*) Eberle noted that DeLuca did not miss time off from work other than the three days previously reported and was not presenting a wage loss claim. (*Id.*) The updated medical records indicated that on November 17, 2017, DeLuca underwent a pain management consultation for ongoing neck pain radiating down to both hands. (*Id.*) At that consultation, DuLuca's cervical MRI from October 2, 2017 was reviewed showing degeneration, and injections were recommended only if physical therapy was unsuccessful. (*Id.*)

Also on February 8, 2018, Eberle left a voicemail for DeLuca. (*Id.*) On February 13, 2018, DeLuca called Eberle back. (*Id.*) DeLuca advised that she was making "good progress" at physical therapy and has not had difficulty with dropping objects in "awhile." (*Id.*) Eberle advised DeLuca that she would continue to obtain medical records from her PIP file and would contact DeLuca again in thirty to sixty days. (*Id.* at 9.) Eberle also inquired about DeLuca falling since the motor vehicle accident, which DeLuca denied. (*Id.*)

Eberle reviewed additional PIP records and DeLuca's prior primary care records on March 19, 2018.  (*Id.*)  She noted DeLuca's prior fractured vertebrae at C2 and three prior rib fractures.  (*Id.*)  On April 20, 2018, Eberle reviewed additional PIP records showing continued physical therapy and complaints of pain which DeLuca attributed to stress.  (*Id.*)  That same day, Eberle left a voicemail for DeLuca.  (*Id.*)  On April 27, 2018, DeLuca returned Eberle's call and advised that she finished physical therapy.  (*Id.* at 10.)  DeLuca also requested an assessment of her case but did not have a specific settlement figure in mind.  (*Id.*)  Eberle told DeLuca that she would obtain the remainder of DeLuca's physical therapy records and finalize her evaluation.  (*Id.*)  During the call, DeLuca stated that she was still doing home exercises, had bilateral numbness to the first three digits in her hands, and had sporadic headaches.  (*Id.*)  However, these conditions did not prevent DeLuca from doing her normal activities.  (*Id.*)

On June 21, 2018, Eberle received and reviewed DeLuca's remaining physical therapy records, which noted that DeLuca was discharged with one hundred percent satisfaction of her treatment.  (*Id.*)  The records noted that DeLuca reported she was significantly better but continued to have stress-related pain.  (*Id.*)  The same day, Eberle evaluated DeLuca's claim and left a voicemail for DeLuca to discuss her evaluation.  (*Id.* at 10–12.)  On June 22, 2018, Eberle discussed her evaluation with DeLuca and offered DeLuca $7,500 to settle her uninsured

motorist claim. (*Id.* at 12.) Eberle explained that the offer was based upon DeLuca's medical treatment and the aggravation of degenerative disc disease. (*Id.*) DeLuca reported that she would consider the offer and call Eberle back on Monday. (*Id.*)

After not receiving a response from DeLuca, Eberle left a voicemail for her on June 27, 2018. (*Id.* at 12–13.) On June 29, 2018, DeLuca returned Eberle's call and inquired how Eberle arrived at the settlement offer. (*Id.* at 13.) Eberle advised DeLuca that she reviewed DeLuca's medical records and considered her injuries and treatment. (*Id.*) DeLuca again wanted time to consider the settlement offer and get back to Eberle. (*Id.*) Eberle left additional voicemails for DeLuca on July 6 and 25, 2018. (*Id.*)

On August 1, 2018, DeLuca returned Eberle's calls demanding the policy limit of $300,000 to settle her uninsured motorist claim. (*Id.*) DeLuca then agreed with Eberle that her claim was not worth $300,000, and revised her demand to $100,000. (*Id.*) Eberle noted that DeLuca's reasoning for the demand was that she believed her ex-boyfriend was responsible for intentionally causing the accident. (*Id.* at 13–14.) DeLuca relayed that she was in fear for her life, she has a PFA order against her ex-boyfriend, her ex-boyfriend just filed a civil lawsuit against her, and that she is now going to psychological counseling to cope with this situation. (*Id.*) Eberle advised DeLuca that the uninsured motorist coverage was

for injuries sustained from the accident, not the other circumstances described, but agreed to review the lawsuit filed by DeLuca's ex-boyfriend. (*Id.* at 14.)

On August 6, 2018, Eberle emailed DeLuca asking for a copy of the civil lawsuit. (*Id.*) DeLuca responded via email on August 23, 2018, indicating that she did not have any civil lawsuit papers nor confirmation that her ex-boyfriend caused the accident. (*Id.* at 15.) Based on this information, Eberle checked the Philadelphia and Luzerne County dockets for any civil or criminal actions against DeLuca or her ex-boyfriend; Eberle found none. (*Id.*) Eberle then left a voicemail for DeLuca to again discuss settlement of the uninsured motorist claim. (*Id.*)

Eberle and DeLuca had a telephone conversation on August 31, 2018, wherein DeLuca expressed three concerns. (*Id.* at 15–16.) First, DeLuca admitted that the unidentified vehicle was not driven by her ex-boyfriend, and wanted an update on the status of the investigation to find that unidentified vehicle. (*Id.* at 15.) Second, DeLuca wanted to know when she would receive a full copy of her medical records. (*Id.*) Eberle advised that she would send DeLuca her records via mail. (*Id.*) Third, DeLuca revised her demand to $300,000 based on the fact that she paid a premium for that coverage limit. (*Id.* at 15–16.) Eberle then offered DeLuca $8,500 to settle the uninsured motorist claim. (*Id.* at 16.) DeLuca responded by demanding the policy limit of $300,000 be paid or she would retain

an attorney.  (*Id.*)  Again, Eberle advised DeLuca that she could not offer the policy limit and reiterated the $8,500 offer.

On September 7, 2018, Eberle sent DeLuca a copy of all medical records and bills in the file.  (*Id.*)  On September 11, 2018, Eberle noted that she had not heard back from DeLuca and calendared to follow up in two weeks.  (*Id.*)  Eberle subsequently left voicemails for DeLuca on September 25, October 9, and October 17, 2018.  (*Id.* at 17.)  On October 19, 2018, Eberle sent a letter and check to DeLuca offering $9,000 to settle her uninsured motorist claim.  (Doc. 31-5.) DeLuca left Eberle a voicemail on October 25, 2018, stating she received Eberle's letter, was rejecting the settlement offer, and that she returned to the chiropractor for further care.  (Doc. 31-3, p. 17.)  She further indicated that she would be returning the check as well as providing new chiropractic and x-ray records.  (*Id.*)

Eberle reviewed DeLuca's PIP file on November 28, 2018, and noted that updated chiropractic records had not yet been received.  (*Id.*)  She further noted that she would review the chiropractic records upon receipt to determine if treatment was related to the accident at issue.  (*Id.* at 17–18.)  On January 7, 2019, Eberle reviewed the updated medical records from the PIP file noting that there was a four-and-a-half-month gap between the conclusion of physical therapy and commencement of chiropractic treatment.  (*Id.* at 18.)  Eberle also noted that

DeLuca reported new mid and upper back pain, as well as numbness in her fingers. (*Id.*)

On February 7, 2019, Eberle reviewed additional medical records indicating that DeLuca was discharged from chiropractic treatment in December 2018 after reaching maximum medical improvement.  (*Id.*)  The same day, Eberle updated her injury evaluation and left a voicemail for DeLuca to make a new settlement offer. (*Id.* at 18–19.)  Eberle and DeLuca spoke via telephone on February 12, 2019, at which time Eberle offered DeLuca $11,500 to settle the uninsured motorist claim. (*Id.* at 19.)  DeLuca again demanded $300,000 to settle her claim and indicated that she was still receiving medical treatment.  (*Id.*)  Eberle also sent a letter that day confirming the $11,500 settlement offer.  (Doc. 31-6.)  On March 20, 2019, Eberle received a handwritten note from DeLuca declining the offer and stating that she was still receiving chiropractic treatment.  (Doc. 31-3, p. 20.)

Eberle reviewed additional medical records from the PIP file on April 5, 2019, noting that DeLuca had eight additional chiropractic appointments from January through March 2019.  (*Id.*)  The PIP file indicated that the PIP claim representative was obtaining a peer review to determine if the chiropractic treatment was related to the accident.  (*Id.*)  On May 14, 2019, Eberle reviewed the claim file indicating that the PIP peer review was still pending.  (*Id.*)  Eberle received additional records and the PIP peer review on June 7, 2019, indicating

10

that the PIP expert believed DeLuca's treatment through December 2018 was reasonable and necessary, but subsequent treatment should be provided on an as-needed basis. (*Id.* at 20–21.) Eberle noted that she would obtain DeLuca's prior neurosurgical records to continue her evaluation and sent the medical authorization for those records on June 13, 2019. (*Id.* at 21.) On July 12 and 18, 2019, Eberle followed up with the medical provider regarding the status of the neurosurgical records. (*Id.* at 21–22.)

DeLuca's counsel advised United Financial of their representation of DeLuca on July 18, 2019. (Doc. 31-1, ¶ 94; Doc. 38, ¶ 94.) Eberle reviewed this letter on July 23, 2019, and sent a letter to DeLuca's counsel that same day enclosing a copy of the insurance policy and advising of her most recent settlement offer. (Doc. 31-3, p. 22.) Eberle also called DeLuca's counsel noting that counsel had not yet reviewed all the medical records or prepared a demand, but would provide a demand within thirty days. (*Id.*) However, DeLuca's counsel did not have any further communication with Eberle or United Financial prior to filing this lawsuit. (Doc. 31-1, ¶ 99; Doc. 38, ¶ 99.)

On August 26, 2019, DeLuca initiated this action by filing a two-count complaint in the Court of Common Pleas of Luzerne County, Pennsylvania. (Doc. 1-1.) United Financial removed the case to this court on September 25, 2019 on the basis of diversity jurisdiction under 28 U.S.C. § 1332. (Doc. 1.) Thereafter,

United Financial filed a motion to dismiss Count 2 of DeLuca's complaint for bad faith.  (Doc. 3.)  The court denied United Financial's motion holding that DeLuca sufficiently pled the elements of a bad faith claim.[4]  (Doc. 6.)

United Financial's present motion for partial summary judgment, brief in support, and statement of facts were filed on December 31, 2020.  (Docs. 31, 32.) DeLuca filed her brief in opposition and answer to statement of facts on January 21, 2021, and United Financial's reply was filed on February 4, 2021.  (Docs. 37, 38, 39.)  Thus, this motion is ripe for review.

## JURISDICTION

The court has diversity jurisdiction in this case based on removal under 28 U.S.C. § 1441(b) and 28 U.S.C. § 1332 because the amount in controversy exceeds $75,000 and the parties are citizens of different states.  Furthermore, venue is proper under 28 U.S.C. § 1391 because this action was pending in the Court of Common Pleas for Luzerne County, Pennsylvania at the time of removal.

## STANDARD OF REVIEW

Federal Rule of Civil Procedure 56 sets forth the standard and procedures for the grant of summary judgment.  Rule 56(a) provides that "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any

---

[4] This opinion was authored by the late Judge James M. Munley.  This case was reassigned to the undersigned on March 24, 2020.

material fact and the movant is entitled to summary judgment as a matter of law."

Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322–323

(1986). A factual dispute is "material" if it might affect the outcome of the suit

under the applicable substantive law, and is "genuine" only if there is a sufficient

evidentiary basis that would allow a reasonable fact-finder to return a verdict for

the non-moving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

When evaluating a motion for summary judgment, a court "must view the facts in

the light most favorable to the non-moving party" and draw all reasonable

inferences in favor of the same. *Hugh v. Butler Cty. Family YMCA*, 418 F.3d 265,

267 (3d Cir. 2005).

The moving party bears the initial burden of demonstrating the absence of a

disputed issue of material fact. *See Celotex*, 477 U.S. at 324. "Once the moving

party points to evidence demonstrating no issue of material fact exists, the non-

moving party has the duty to set forth specific facts showing that a genuine issue of

material fact exists and that a reasonable factfinder could rule in its favor." *Azur v.*

*Chase Bank, USA, Nat'l Ass'n*, 601 F.3d 212, 216 (3d Cir. 2010). The non-moving

party may not simply sit back and rest on the allegations in its complaint; instead,

it must "go beyond the pleadings and by [its] own affidavits, or by the depositions,

answers to interrogatories, and admissions on file, designate specific facts showing

that there is a genuine issue for trial." *Celotex*, 477 U.S. at 324 (internal quotations

omitted); *see also Saldana v. Kmart Corp.*, 260 F.3d 228, 232 (3d Cir. 2001).

Further, the non-moving party cannot rely on "general denials or vague

statements." *Shaeffer v. Schamp*, No. 06-1516, 2008 WL 2553474, at *4 (W.D.

Pa. June 25, 2008) (quoting *Trap Rock Indus. v. Local 825, Int'l Union of

Operating Eng'rs*, 982 F.2d 884, 890 (3d Cir. 1992)). Summary judgment should

be granted where a party "fails to make a showing sufficient to establish the

existence of an element essential to that party's case, and on which that party will

bear the burden at trial." *Celotex*, 477 U.S. at 322–23. "Such affirmative evidence

– regardless of whether it is direct or circumstantial – must amount to more than a

scintilla, but may amount to less (in the evaluation of the court) than a

preponderance." *Saldana*, 260 F.3d at 232 (quoting *Williams v. Borough of West

Chester*, 891 F.2d 458, 460-61 (3d Cir. 1989)).

## DISCUSSION

United Financial moves for judgment in its favor on Count 2 of DeLuca's

complaint for bad faith. (Doc. 32.) Applying Pennsylvania law, United Financial

argues that it is entitled to a judgment in its favor because there is a genuine

dispute over the value of DeLuca's UM claim. (*Id.* at 6–15.) DeLuca contends

that summary judgment is inappropriate because a genuine issue of material fact

exists regarding whether United Financial acted in bad faith in investigating and

valuing DeLuca's UM claim.

Pennsylvania's bad faith insurance statute provides:

> In an action arising under an insurance policy, if the court finds that the insurer has acted in bath faith toward the insured, the court may take all of the following actions:
>
> (1) Award interest on the amount of the claim from the date the claim was made by the insured in an amount equal to the prime rate of interest plus 3%.
> (2) Award punitive damages against the insurer.
> (3) Assess court costs and attorney fees against the insurer

42 Pa. C.S. § 8371.  The Pennsylvania Supreme Court has interpreted this statute and held that, to recover for bad faith, a plaintiff must provide clear and convincing evidence that: (1) "the insurer did not have a reasonable basis for denying benefits under the policy;" and (2) "the insurer knew of or recklessly disregarded its lack of a reasonable basis."  *Rancosky v. Wash. Nat'l Ins. Co.*, 170 A.3d 364, 365 (Pa. 2017) (adopting the two-part test previously articulated by the Pennsylvania Superior Court in *Terletsky v. Prudential Prop. & Cas. Ins. Co.*, 649 A.2d 680 (Pa. Super. Ct. 1994)); *see also Wolfe v. Allstate Prop. & Cas. Ins. Co.*, 790 F.3d 487, 489 (3d Cir. 2015) (applying *Terletsky* and opining that the Pennsylvania Supreme Court would adopt the *Terletsky* two-part test).  The first prong of the *Terletsky* test is "an objective inquiry into whether a reasonable insurer would have denied [or delayed] payment of the claim under the facts and circumstances presented."  *Rancosky*, 170 A.3d at 374.  Although probative to the second prong of the *Terletsky* test, "proof of the insurer's subjective motive of self-interest or ill-will . . . is not a necessary prerequisite to succeeding in a bad faith claim."  *Id.* at 377.

15

Further, "mere negligence or bad judgment is not bad faith." *Miezejewski v. Infinity Auto Ins. Co.*, 609 F. App'x 69, 72 (3d Cir. 2015) (quoting *Grossi v. Travelers Personal Ins. Co.*, 79 A.3d 1141, 1148 (Pa. Super. Ct. 2013)).

In opposing an insurer's summary judgment motion, the insured's burden is as "commensurately high" as the clear and convincing trial standard "because the court must view the evidence presented in light of the substantive evidentiary burden at trial." *Northwestern Mut. Life Ins. Co. v. Babayan*, 430 F.3d 121, 137 (3d Cir. 2005) (quoting *Kosierowski v. Allstate Ins. Co.*, 51 F. Supp. 2d 583, 588 (E.D. Pa. 1999)).  This heightened standard "requires evidence so clear, direct, weighty and convincing as to enable a clear conviction, without hesitation, about whether or not the defendant[] acted in bad faith." *Miezejewski*, 609 F. App'x at 70 (quoting *Post v. St. Paul Travelers Ins. Co.*, 691 F.3d 500, 523 (3d Cir. 2012)). In the uninsured or underinsured motorist context, the burden does not change for the insurer in that it is still held to a duty of good faith and fair dealing, nor does the burden change for the insured in the context of proving a bad faith claim. *Condio v. Erie Ins. Exch.* 899 A.2d 1136, 1144–45 (Pa. Super. Ct. 2006).

A dispute as to the value of an insured's claim is not unusual and does not, without more, amount to bad faith. *See Miezejwski*, 609 F. App'x at 72–73 (finding that providing settlement offers within the claims representative's initial and ongoing valuations was not bad faith); *Smith v. State Farm Mut. Auto. Ins. Co.*,

506 F. App'x 133, 136–37 (3d Cir. 2012) (noting that a disagreement over the settlement amount of a UIM claim is not unusual but "the failure to immediately accede to a demand for the policy limit cannot, without more, amount to bad faith").

In this case, the court finds that DeLuca has not presented any genuine issue of material fact, nor has she met the standard required to prove a bad faith claim. On September 6, 2017, just nine days following the hit and run accident, United Financial opened a UM claim for DeLuca.  Claims representative Eberle conducted an initial review the following day and was in frequent contact with DeLuca regarding the accident and her injuries until this lawsuit was filed.  During this time, Eberle consistently reviewed DeLuca's PIP file and obtained updated medical records on numerous occasions.  Because DeLuca was continuing with medical treatment, Eberle and United Financial did not evaluate DeLuca's claim until Eberle received and reviewed DeLuca's records discharging her from physical therapy with one hundred percent satisfaction on June 21, 2018.  Eberle then immediately evaluated DeLuca's claim and offered her $7,500 to settle the UM claim based on DeLuca's medical treatment and the aggravation of her degenerative disc disease.  Thereafter, Eberle respected DeLuca's request of time to consider the settlement offer.

17

DeLuca countered United Financial's offer demanding the policy limits of $300,000 on August 1, 2018. Eberle listened to DeLuca's reasoning for that demand and, after a discussion, DeLuca revised her demand to $100,000. Although unrelated to the UM claim, Eberle investigated DeLuca's claims that her ex-boyfriend was the other driver and that he filed a lawsuit against DeLuca. By August 31, 2018, DeLuca increased her demand to $300,000 again, whereas Eberle increased United Financial's offer to $8,500. Eberly continued to follow up with DeLuca throughout the Fall of 2018 and, on October 19, 2018, offered $9,000 to settle the UM claim. DeLuca rejected that offer and notified Eberle that she returned to the chiropractor for further care.

Eberle reviewed updated chiropractic records and noted that DeLuca was discharged from treatment in December 2018 after reaching maximum medical improvement. Eberle subsequently updated her evaluation and offered DeLuca $11,500 on February 12, 2019. However, DeLuca again rejected that offer and demanded $300,000 to settle her UM claim advising that she was still receiving chiropractic care. Eberle continued to update DeLuca's file and obtain additional medical records through July 18, 2019. At that time, United Financial was notified that counsel now represented DeLuca and an updated demand would be provided. No additional demand was submitted to United Financial prior to the filing of this lawsuit.

While not providing the court with any evidence in support of the assertion, DeLuca asserts that there is "irrefutable proof" that United Financial acted in bad faith due to the "nominal offers" that "fail to align with Plaintiff's injuries and/or damages." However, as the Third Circuit and this court have made clear, a disagreement over the value of DeLuca's claim and failing to merely offer the policy limits does not equate to bad faith, without more, on the part of United Financial. *See Smith*, 506 F. App'x at 136–37; *see also Calestini v. Progressive Cas. Ins. Co.*, No. 3:09-cv-1679; 2010 WL 5437278, at * 4 (M.D. Pa. Dec. 28, 2010) ("Defendant has not failed to expeditiously evaluate Plaintiff's claim when there was, and still is, a genuine dispute over the claim's value."). Here, DeLuca has not provided anything more that would cause the court to find that United Financial did not have a reasonable basis for denying benefits. Thus, the court holds that DeLuca failed to meet her burden and will grant United Financial's motion for partial summary judgment as to the bad faith claim (Count 2).

CONCLUSION[5]

For the reasons stated herein, the court will grant United Financial's motion

for partial summary judgment.  (Doc. 31.)  An appropriate order will issue.

s/Jennifer P. Wilson
JENNIFER P. WILSON
United States District Court Judge
Middle District of Pennsylvania

Dated:  September 22, 2021

---

[5] United Financial filed a motion to bifurcate the bad faith claim on April 7, 2021.  (Doc. 42.)
This motion has been fully briefed by the parties.  (Docs. 43, 57, 58.)  Because the court is
granting judgment in favor of United Financial as to the bad faith claim, the motion to bifurcate
will be denied as moot.